UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DEFREESE SMITH, <br><br> Plaintiff, <br><br> v. <br><br> BRYAN CIPOLLA, et al. <br><br> Defendants. | No. 21 CV 1387 <br><br> Judge Manish S. Shah |

**MEMORANDUM OPINION AND ORDER**

Defreese Smith worked at a Sony distribution facility for fourteen years before being fired in 2018. She believes that her termination and treatment by management were attributable to her race and gender. After filing a complaint with the EEOC, she sued in federal court, alleging violations of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981, among other things. She named as defendants three managers and Sony DADC. Defendants now move for summary judgment. The motion is granted.

**I.   Legal Standard**

Summary judgment is proper when there is no genuine dispute of any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). I construe all facts and reasonable inferences in favor of Smith, the nonmoving party. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 378 (7th Cir. 2020). But the defendants are entitled to summary judgment if plaintiff fails to make "a sufficient showing on an essential element" of her case for which she has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## II. Local Rule 56.1 and Evidentiary Issues

Local Rule 56.1 "aims to make summary-judgment decisionmaking manageable for courts." *Kreg Therapeutics, Inc. v. VitalGlo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). The rule requires the moving party to file a statement of facts that demonstrates its entitlement to judgment as a matter of law. *Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014); N.D. Ill. Local R. 56.1(a)(3). The nonmoving party must file a response to that statement and may provide a separate statement of additional facts. *Petty*, 754 F.3d at 420; N.D. Ill. Local R. 56.1(b)(3). Both statements of facts and statements of additional facts must consist of concise numbered paragraphs, supported by citations to specific pages in the evidentiary record. *See* N.D. Ill. Local R. 56.1(d)(1)–(2). Evidence supporting or opposing summary judgment must be admissible if offered at trial, although depositions and other written testimony can substitute for live testimony. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014).

Any fact not properly controverted is admitted. N.D. Ill. Local R. 56.1(e)(3); *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). If the responding party disagrees with the other party's fact, it must cite specific parts of the record disputing the fact and "concisely explain how the cited material controverts the asserted fact." N.D. Ill. Local R. 56.1(e)(3). Facts that a party raises in a Local Rule 56.1 response that do not controvert the asserted fact, and that are not included in the party's statement of additional facts, are stricken. N.D. Ill. Local R. 56.1(e)(2). So are facts that are supported only by inadmissible evidence, provided the opposing party objects on that basis. *Widmar*, 772 F.3d at 460.

2

Smith did not follow the rule. She did not submit the required response to defendants' statement of material facts. Nor did she file a statement of additional material facts, which, though not required, might have helped her case. What's more, her handwritten notes contesting the truth of various incident reports are inadmissible because she didn't submit a sworn declaration testifying to the truth of her own statements.

It is true that pro se litigants, like plaintiff, are entitled to more leniency than plaintiffs with representation. The rationale behind that principle is that courts should "give a pro se plaintiff a break when, although [she] stumbles on a technicality, [her] pleading is otherwise understandable." *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001). But failing to respond to *all* of defendants' facts, then not submitting a response brief that could at least explain her version of events isn't stumbling on a technicality. Courts aren't "obliged in our adversary system to scour the record looking for factual disputes." *Zoretic v. Darge*, 832 F.3d 639, 641 (7th Cir. 2016) (quoting *Greer*, 267 F.3d at 727). Because Smith failed to contest defendants' statement of facts, those facts are admitted and accepted in their entirety.

### III. Facts

Smith worked for a Sony DADC distribution facility from 2004 to 2018. [57] ¶ 5.[1] The facility distributed digital content, like movies and video games on DVDs and Blu-ray discs. [57] ¶ 1. The company had policies prohibiting certain behaviors

---

[1] Bracketed numbers refer to entries on the district court docket and page numbers refer to the CM/ECF header placed at the top of filings. For the reasons explained above, all facts are taken from defendants' statement of material facts, [57].

3

in the workplace, including disruptive behavior; inappropriate language and conversations; use of threatening, abusive, or offensive language or actions; acts or threats of physical violence; and discrimination and harassment. [57] ¶ 9. The company also had a hotline operated by a third party that employees could use to confidentially report work-related issues or concerns. [57] ¶ 11. Trained hotline representatives listened to complainant's concerns, wrote those concerns down in a report, and sent the report to Sony. [57] ¶ 11. Throughout Smith's time at the facility, she reported a number of incidents, both directly and via the hotline. *See* [57].

In 2007, during a meeting with Sony management and plaintiff, a supervisor told plaintiff that the supervisor "didn't know why [the supervisor] didn't like [plaintiff] like other people." [57] ¶ 12. The supervisor was fired and plaintiff was assigned a new one. [57] ¶ 13. In 2016, plaintiff told Bryan Cipolla, the facility's Director of Human Resources, that she was being paid incorrectly. [57] ¶¶ 2, 14. She filed a wage claim with the Illinois Department of Labor for $3,400 in back wages. [57] ¶ 15. Sony disagreed that it had an obligation to pay Smith, but it paid her the full amount. [57] ¶ 16. After it did, the Department of Labor dismissed the claim. [57] ¶ 16.

In early 2017, plaintiff told Therese Skalnik, the facility's Manager of Human Resources, that a male temporary employee made inappropriate sexual comments and gestures toward plaintiff at work. [57] ¶¶ 3, 19. Skalnik started and finished an investigation into the incident that same day. [57] ¶ 20. Based on the investigation, which involved interviewing plaintiff, the temporary employee, a supervisor, and two

other employees whom the supervisor identified as potential witnesses, Skalnik concluded that the employee violated company policy and fired the employee the same day. [57] ¶¶ 20–21. She reported the incident to the police the next day. [57] ¶ 21.

In mid-2017, plaintiff complained to her supervisor, Mark Motykowski, that another employee had been talking to her about a non-work-related issue. [57] ¶¶ 4, 23. The company also received a report that plaintiff made a complaint to the hotline, saying the employee had nitpicked plaintiff's performance, and that when plaintiff spoke to Motykowski about her concern, Motykowski said that he didn't see what the problem was. [57] ¶ 24. Skalnik and Cipolla investigated the complaint and interviewed the employee, plaintiff, and Motykowski. [57] ¶ 25. They found no violation of company policy. [57] ¶ 27.

In early 2018, plaintiff complained about a coworker who, she said, kicked a pallet in her direction and had yelled at her before. [57] ¶ 28. Sony interviewed the employee, plaintiff, and Motykowski, but the investigation's findings were inconclusive. [57] ¶ 29. Skalnik told plaintiff that although the findings were inconclusive, she should still bring any concerns to management or human resources if she ever felt afraid or uncomfortable. [57] ¶ 30. Sony reviewed the company policy on harassment, discrimination, and retaliation with the accused employee, and told him to bring his concerns to management if he ever had an issue with another employee. [57] ¶ 31. Months later, in mid-2018, plaintiff told Skalnik that another coworker told plaintiff that he'd witnessed the other employee kick the pallet. [57] ¶ 32. Plaintiff also told Skalnik that the other employee (the one accused of kicking

5

the pallet) refused to give plaintiff boxes that she needed that day. [57] ¶ 32. Skalnik interviewed the alleged witness to the pallet-kicking. [57] ¶ 33. In fact, he told Skalnik, he'd told plaintiff that he *hadn't* seen the other employee kick a pallet and that the other employee didn't purposely withhold boxes from coworkers. [57] ¶ 33. Skalnik interviewed the other employee again, who said he hadn't deliberately withheld boxes from Smith and, in fact, hadn't had issues with her at all. [57] ¶ 34. Despite deciding that the findings were inconclusive, Skalnik reviewed the company policy on harassment, discrimination, and retaliation with the employee for a second time. [57] ¶ 36.

On May 24, 2018, an employee told Skalnik and Cipolla that Smith approached two coworkers and asked if they'd heard that a Sony supervisor had died. [57] ¶ 37. According to the person who reported the comment, Smith then said that she "wasn't wishing her dead, but she got what she deserved." [57] ¶ 37. One of the coworkers who Smith was speaking to was close with the deceased supervisor and was upset by the comment. [57] ¶ 38. That coworker then shared the comment with another coworker, Jill, who was also close with the deceased supervisor. [57] ¶ 38. Jill approached Motykowski, plaintiff's supervisor, who happened to be talking to plaintiff at the time. [57] ¶ 39. Jill said she wouldn't allow anyone to make disparaging comments about the supervisor and would have an issue with anyone who did. [57] ¶ 39. Jill then went to Cipolla and told him about the comment. [57] ¶ 41.

That same day, May 24, plaintiff called Skalnik; said she had talked to Jill; that Jill had told her, "now is not the best time"; and walked away. [57] ¶ 42. Also on the same day, the company received a report from the hotline provider that plaintiff called and reported a different version of events. *See* [57] ¶ 43. Specifically, she said that Jill became angry with her when she asked why Jill was upset, and Jill told her, "[i]f you know what's best, you'll get away from me." [57] ¶ 43. Plaintiff also reported that employees named Falipa and Nicole witnessed the incident. [57] ¶ 43. The next day, the company received a report from the hotline provider that plaintiff had called the hotline to make a correction to her initial report. [57] ¶ 44. She said Falipa did not hear Jill yelling at Motykowski but had heard Jill yell at plaintiff. [57] ¶ 44. The company opened investigations both into Jill's report about plaintiff's comments regarding the deceased supervisor and into whether Jill's conduct in response to those comments was inappropriate. [57] ¶ 47.

The company received a report from the hotline provider that on May 26, plaintiff called at 7:51 a.m. CST to say that Motykowski told her there was an ongoing investigation involving her, but wouldn't tell her the topic of the investigation, which she believed was inappropriate. [57] ¶ 45. She also said she believed Skalnik had secretly summoned Jill to listen in on plaintiff's May 24 call to Skalnik and that Matykowski and Skalnik were conspiring with Jill to fabricate allegations against her. [57] ¶ 45. Plaintiff's belief was wrong; Skalnik didn't invite Jill to listen in to the conversation, nor was Jill present for it. [57] ¶ 46. The company received a report that roughly an hour later, at 9:02 a.m. CST on May 26, plaintiff called to accuse a

7

coworker named Linda of making false comments about things plaintiff said and sharing plaintiff's actual comments with Linda. [57] ¶ 48. (Linda was not the person who told Jill about plaintiff's comments. [57] ¶ 49.)

The same day that plaintiff made two hotline reports roughly an hour apart, she left three voicemails for management. [57] ¶¶ 45, 48, 50–52. The first was to her supervisor, Motykowski. [57] ¶ 50. Among other things, she said that Linda was working on behalf of Linda's sister, a former Sony employee. [57] ¶ 50. She also said, "[y]ou all want to get me fired, I tell you what you can do to get me fired, if you want a quick way to get me fired, put Linda up in my face, you better never put Linda with me, job well done Mark, job well done." [57] ¶ 50. Her second voicemail was also to Motykowski. [57] ¶ 51. In it, she explained how she'd figured out that Linda was the one who'd informed Jill of her comments. [57] ¶ 51. The third voicemail was to Skalnik. [57] ¶ 52. It was 12 minutes long. [57] ¶ 52. It included the following comments: "Don't never put Linda around me"; plaintiff had "figured it all out, it was Linda when she went on break at 2:45"; Linda was a "little knifing person and a flunky for Sony because she brought back false words this time and once again I am sorry Jill had to go through this because of the hands of Linda"; plaintiff was going to buy Linda a wig so her threads didn't show; and, "it's okay cause ain't nobody gonna come up to me and say anything outside of Sony." [57] ¶ 52.

Two days later, on May 28, the company received a report that an anonymous call was made to the hotline. [57] ¶ 53. The anonymous caller said that two coworkers, Defreese [presumably plaintiff] and Denise, said they'd reported Jill and Matykowski

to the ethics hotline and Jill and Matykowski would be getting into trouble. [57] ¶ 53. (It is not clear whether Defreese and Denise told the anonymous caller that Jill and Matykowski would be getting into trouble, or whether the anonymous caller themself was saying that Jill and Matykowski would be getting into trouble.) The anonymous caller also said that Defreese and Denise said Jill was "a white girl who thinks she's Black." [57] ¶ 53. The caller requested that the company investigate Defreese and Denise and be made aware that the claims against Jill and Motykowski weren't true. [57] ¶ 53.

The next day, May 29, plaintiff left a voicemail for Motykowski. [57] ¶ 54. Among other things, she said she was sure Linda and another employee had conspired to lie about her, and that Denise might be in on it, too. *See* [57] ¶ 54. She also requested that she not have to work with Linda because she didn't want problems, and said that Linda was "looking like Zandra" on "that movie Charlton Heston Planet of the Apes." [57] ¶ 54.

The same day, Skalnik and the Sony Director of Operations met with plaintiff about her recent conduct and her alleged comments about the deceased supervisor. [57] ¶ 55. Plaintiff admitted that she said, "I don't wish nothing on her, but [I'm] glad she was gone." [57] ¶ 56. Plaintiff said she meant "gone from Sony, though." [57] ¶ 56. When asked if she understood how that could be hurtful to someone close to the supervisor, plaintiff backtracked. *See* [57] ¶ 57. She denied making the comment she'd just admitted to, and instead said she'd had those thoughts in her mind but hadn't said them out loud. [57] ¶ 57. Skolnik and the director of operations also spoke

9

with plaintiff about the voicemails she'd been leaving and explained that Linda had nothing to do with the incident. [57] ¶ 58.

After the meeting, plaintiff went on her lunch break, then returned to her work area. [57] ¶ 59. She then got up and made her way to the Human Resources office, crying and yelling that she wanted to go home. [57] ¶ 59. Skalnik tried to comfort Smith and figure out what happened, but Smith kept crying and yelling that she wanted to go home. [57] ¶ 60. Skalnik said Smith could go home and offered to get her a ride, call a cab, or do whatever Smith needed. [57] ¶ 60. Skalnik accompanied Smith to the facility's exit. [57] ¶ 60. Smith cried and yelled as they walked through two buildings to reach the security scanner at the exit. [57] ¶ 60. While waiting at the scanner, Smith began banging her hands and fists on the walls of the scanner, yelling and crying that she wanted to go home. [57] ¶ 61.

Later that day, after Smith left, she called Skalnik three times. [57] ¶ 61. Skalnik told plaintiff that they were in the process of closing out the investigation and that she would follow up with plaintiff the next day. [57] ¶ 61. Skalnik also said that plaintiff's inappropriate comments and threats needed to stop, the disruption that occurred in the warehouse couldn't happen again, and plaintiff needed to stop trying to figure out who had reported her comments about the deceased supervisor to Jill. [57] ¶ 61.

From the early hours of May 30 through the early hours of May 31, Smith texted Motykowski at least twelve times. [57] ¶ 62. In those texts, she said that people were lying, Jill was starting trouble, plaintiff hadn't said anything about the "lady

10

that pass," and, "I told the trueth [sic] and anger took me there." [57] ¶ 62. In some of her last messages, she said, "Its [sic] ok though God will take Care of it all," "Then they can walk me out," and "My envestigation [sic] is over I had to help myself." [57] ¶ 62.

When plaintiff arrived at work the morning of May 31, roughly an hour and a half after sending her last text message to Motykowski, the director of operations told her to go home. [57] ¶ 63. He told Skalnik and Cipolla that he was "not comfortable with having her onsite" after reading the messages. [57] ¶ 63. That evening, Smith returned to texting Motykowski. [57] ¶ 64. Among other things, she said that she didn't do anything wrong, she'd been angry, an employee named "Laraine" didn't like plaintiff and, "I did nothing to her, I did nothing to no one." [57] ¶ 64. The next day, June 1, Smith left a similar voicemail for Cipolla. *See* [57] ¶ 65. She said that she didn't do anything wrong; didn't make any of the alleged comments about the deceased supervisor; and simply said she was glad the supervisor was gone from Sony, not that she was dead. [57] ¶ 65. Smith also said that Lorraine had it out for her. [57] ¶ 65. She also asked about her employment status. [57] ¶ 65.

Sony's investigation yielded inconclusive findings about plaintiff's alleged comments on the deceased supervisor. [57] ¶ 66. Based on findings from the investigation, though, Sony did discipline Jill for her behavior in the workplace on May 24. [57] ¶ 66. Skalnik and Cipolla decided to fire plaintiff based on her behavior surrounding the investigation into her comments. [57] ¶ 67. Motykowski wasn't involved in that decision. [57] ¶ 70. Smith and Cipolla were concerned about Smith's

11

repeated disruptions, her repeated attempts to figure out who reported her comments, her wrongful accusations that certain coworkers had reported the comments, and her threatening and offensive remarks about coworkers. [57] ¶ 67. They were also concerned about the inconsistent statements she made during the investigation about her comments. [57] ¶ 67. They believed she was a threat to workplace safety. [57] ¶ 67. On June 1, Cipolla called plaintiff and fired her. [57] ¶ 69.

On August 13, 2018, plaintiff filed a charge of discrimination with the Illinois Department of Human Rights and the Equal Opportunity Commission. [57] ¶ 73. She alleged that her hours were reduced because of her age, race, and color, and that she was fired for the same reasons. [57] ¶ 73. Roughly two years later, the EEOC sent notice to Smith, informing her that the commission had adopted the state's findings and that it was closing its file on the charge. [57] ¶ 74 (citing [57-9] at 30).

Plaintiff brought claims under 42 U.S.C. §§ 1981, 1983, 1985(3), and Title VII. [1]. She also brought various state-law claims. [1]. Defendants moved to dismiss. [24]. I granted the motion with respect to plaintiff's state-law claims and her 42 U.S.C. §§ 1983 and 1985(3) claims. [30] at 2. I allowed Smith to proceed on her Title VII claim against only Sony and on her § 1981 claim against all four defendants.[2] Defendants now move for summary judgment. [55].

---

[2] That does not include David Rubenstein, CEO of Sony DADC US, whom plaintiff named in her complaint. He was dismissed because he was not properly served and did not waive service. [30] at n.1.

### IV. Analysis

Defendants argue that claims of discrimination tied to certain incidents are outside the statute of limitations for Title VII and Section 1981 and should therefore be dismissed. They also say that Motykowski was not involved in the decision to fire plaintiff, so should be dismissed from Smith's Section 1981 termination-related claims. For the remaining claims and defendants, defendants say that Smith cannot make out a prima facie case of race discrimination, or, at least, cannot show that defendants' reasons for taking certain actions (including firing her) were pretextual.

#### A. Statute of Limitations

Before filing a Title VII claim in court, a plaintiff in a state with an agency that enforces fair employment laws (the Illinois Department of Human Rights in this case) must file a complaint with the state agency. *See* 42 U.S.C § 2000e-5(c). Once the plaintiff has filed with the state agency, she must file with the Equal Employment Opportunity Commission. 42 U.S.C. § 2000e-5(e)(1). She can do this starting 60 days after filing with the state, assuming that the state proceedings haven't already been terminated. 42 USC 2000e-5(c). She *must* file her complaint with the EEOC either 300 days after the alleged unlawful employment practice occurred, or 30 days after receiving notice that the state has terminated proceedings, whichever is earlier. 42 USC § 2000e-5(e)(1). Neither the 60- nor 30-day timelines is relevant here because defendants don't challenge plaintiff's timeliness in filing with the EEOC, and when Smith filed her complaint with the Illinois Department of Human Rights, she indicated that she wanted the department itself to send her complaint to the EEOC. *See* [57-9] at 26.

Smith filed her complaint with the Illinois Department of Human Rights (and therefore with the EEOC, since she indicated that she wanted the department to forward her complaint to the EEOC, [57-9] at 26) on August 13, 2018. [57] ¶ 73. October 17, 2017, is 300 days before that. Any conduct before then therefore isn't actionable under Title VII. *See* 42 USC § 2000e-5(e)(1). The only post-October 17, 2017 Title VII claims that Smith brought in her complaint before this court are the ones concerning her termination, so only termination is relevant for Title VII purposes.

The statute of limitations for Section 1981 claims based on termination is four years. 28 U.S.C. § 1658; *Campbell v. Forest Pres. Dist.*, 752 F.3d 665, 667–68 (7th Cir. 2014). Smith filed her complaint in federal court on March 11, 2021, [1], so any conduct before March 11, 2017, isn't actionable under Section 1981.

In their statement of facts, defendants note plaintiff's testimony that, after my opinion on the motion to dismiss, her only remaining claims are race-discrimination claims related to her termination. [57] ¶ 76. Defendants note this again in their opening brief. [56] at 15. This implies that, through her deposition testimony, plaintiff dropped her sex-discrimination claims, as well as her claims based on the incidents in mid-2017 and early 2018. *See* [57] ¶¶ 23–29. One of those incidents involved an employee allegedly talking to Smith about a non-work-related issue and nitpicking her performance. [57] ¶¶ 23–24. Another one involved an employee allegedly kicking a pallet in Smith's direction and refusing to give her boxes she needed to work. [57] ¶¶ 28, 32. A plaintiff's deposition testimony, however, cannot serve to amend her

14

complaint. *See Stepp v. Covance Cent. Lab'y Servs., Inc.*, 931 F.3d 632, 634 (7th Cir. 2019) ("A plaintiff may testify in a manner that dooms [her] claim on the merits, but unfavorable deposition testimony does not amend the complaint."). Plaintiff's Section 1981 claim continues to be based on those two incidents, in addition to her termination, and plaintiff's Title VII claim continues to be based on both sex discrimination and race discrimination.

### B. Discrimination

Title VII prohibits discrimination in the workplace on the basis of race, color, religion, sex, national origin, sexual orientation, and transgender identity. *Bostock v. Clayton County*, -- U.S. ---, ---, 140 S. Ct. 1731, 1737 (2020). Section 1981 guarantees the right to "make and enforce contracts" to all citizens, regardless of race, 42 U.S.C. § 1981(a), and the equal "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," § 1981(b). It bars racially discriminatory decisions in, among other things, the hiring and firing of employees and retaliation against employees. *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 446 (2008). In contrast to Title VII, Section 1981 bars discrimination only on the basis of race.

Title VII and Section 1981 claims are analyzed under the same framework at summary judgment, *Lane v. Riverview Hosp.*, 835 F.3d 691, 695 (7th Cir. 2016), though the causation standards for the two are different. Under Title VII, a plaintiff must only demonstrate that race (or the relevant protected characteristic) was a motivating factor in the adverse employment decision. 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174–75 (2009) (contrasting Title VII's explicit motivating-factor language with absence of such

15

language in ADEA). A more exacting standard governs Section 1981 claims. A plaintiff must show that, but for her race, the adverse employment action wouldn't have occurred. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, -- U.S. ---, ---, 140 S. Ct. 1009 (2020). As will become clear below, the different causation standards don't make a difference here because there is no evidence that race or gender played any role in defendants' decision-making.

At summary judgment, courts use the *McDonnell Douglas* burden-shifting test to help decide whether a plaintiff has shown discrimination. "Under its terms, once a plaintiff establishes a prima facie case of race discrimination…the defendant bears the burden of producing a race-neutral explanation for its action, after which the plaintiff may challenge that explanation as pretextual." *Comcast Corp.*, 140 S. Ct. at 1019. The court must look at the evidence as a whole to decide whether there is no genuine dispute of material fact. *See Lane*, 835 F.3d at 698. The framework isn't "rigid." *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978). It is just a helpful and orderly way to evaluate evidence and answer the overarching question: was this employment decision based on a protected characteristic? *See Furnco Constr. Corp.*, 438 U.S. at 577; *see also Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764, 766 (7th Cir. 2016).

To make out a prima facie case, a plaintiff must show: 1) she is a member of a protected class, 2) she was meeting the employer's legitimate expectations, 3) she suffered an adverse employment action, and 4) similarly situated employees not in her protected class were treated more favorably. *Coleman v. Donahoe*, 667 F.3d 835,

845 (7th Cir. 2012); *Naik v. Boehringer Ingelheim Pharms., Inc.*, 627 F.3d 596, 599–600 (7th Cir. 2012). Only the second and fourth elements are at issue in the termination-related claims, and only the fourth element is at issue in the claims based on the other incidents.

Smith must show that she was meeting Sony's expectations at the time she was fired. *See Naik*, 627 F.3d at 600. That includes showing that she wasn't violating Sony's policies. *See id.* She hasn't made that showing. Sony maintained policies prohibiting disruptive behavior; inappropriate language and conversations; use of threatening, abusive, or offensive language; and acts or threats of physical violence. [57] ¶ 9. As an employee, plaintiff was responsible for reading and adhering to those policies. [57] ¶ 8. Sony also had a code of conduct prohibiting all forms of harassment, including derogatory comments and threats. [57] ¶ 10. Plaintiff failed to abide by those policies and the code of conduct. From May 24, 2018, until she was fired on June 1, 2018, plaintiff violated company policy in multiple ways.

She threatened violence. Specifically, in voicemails on May 26, she said, "if you want a quick way to get me fired, put Linda up in my face, you better never put Linda with me," and "Don't never put Linda around me." [57] ¶¶ 50, 52. She engaged in harassing behavior against Skalnik and Motykowski, leaving lengthy and multiple voicemails accusing another coworker of reporting her. [57] ¶¶ 50–52, 54. She also texted Motykowski in the early hours of May 30 and 31, 2018, including texts that included, "God will take Care of it all," "Then they can walk me out," and "My envestigation [sic] is over I had to help myself." [57] ¶ 62. She made derogatory

17

comments about coworkers. Specifically, she called Linda "a knifing person and a flunky for Sony" and compared her to a character from *Planet of the Apes*. [57] ¶¶ 52, 54. According to a report placed to the hotline, Smith also called Jill a "white girl who thinks she's Black." [57] ¶ 53. Finally, her behavior was disruptive to the workplace. As she was walked out of the building on May 29, she began banging her hands and fists on the walls of the security scanner and yelling that she wanted to go home. [57] ¶¶ 59–60. At the time she was fired, plaintiff was failing to meet Sony's legitimate expectations that she abide by company policies about appropriate workplace conduct.

Smith must also show that there was at least one similarly situated employee who was not in her protected class and who received more favorable treatment than her. For her Title VII claim, this means identifying a male employee or non-Black employee who engaged in similar behavior but wasn't fired. For her Section 1981 claim, this means identifying a non-Black employee who wasn't fired for similar behavior, and who was treated more favorably in incidents similar to the ones plaintiff says occurred in mid-2017 and early 2018.

In general, a comparator must have 1) dealt with the same supervisor, 2) been subject to the same standards, and 3) engaged in similar rule or policy violations. *Coleman*, 667 F.3d at 847. "Precise equivalence" isn't required. *Id.* at 846 (quoting *McDonald v. Santa Fe Trail Trans. Co.*, 427 U.S. 273, 283 n.11 (1978)). "So long as the distinctions between the plaintiff and the proposed comparators are not so significant that they render the comparison effectively useless, the similarly-situated

requirement is satisfied." *Id.* (citation and quotations omitted). In failing to file a response to defendants' statement of material facts or file a statement of additional material facts, plaintiff hasn't identified a similarly situated employee for any of the three allegedly discriminatory incidents (including termination).

Plaintiff cannot show that she was meeting legitimate expectations when she was fired. Nor has she identified similar situated employees for her May 2017, January 2018, or termination incidents. The inquiry ends there—her Title VII and Section 1981 claims cannot survive summary judgment. *See Chatman v. Bd. of Educ.*, 5 F.4th 738, 747 (7th Cir. 2021) ("It is not always necessary to march through this entire process if a single issue proves to be dispositive.") (citation and quotations omitted).

## V. Conclusion

Defendants' motion for summary judgment, [55], is granted. Enter judgment and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: March 27, 2023